United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| GUZIK TECHNICAL ENTERPRISES, INC., | Case No.: 5:11-cv-03786-PSG |
| Plaintiff and Counterclaim Defendant, | |
| v. | **ORDER RE: WESTERN DIGITAL'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT ON NONINFRINGEMENT** |
| WESTERN DIGITAL CORPORATION, et al., | |
| Defendants and Counterclaim Plaintiffs, | **(Re: Docket Nos. 131, 234, 235, 260, 262, and 276)** |
| and | |
| WESTERN DIGITAL (THAILAND) COMPANY LIMITED and WESTERN DIGITAL (MALAYSIA) SDN.BHD, | |
| Defendants. | |

Among its claims, Plaintiff Guzik Technical Enterprises ("GTE") accuses Defendants

Western Digital Corp., et al. (collectively, "Western Digital") of infringing U.S. Patent No.

6,023,145 ("the '145 patent"). Before the court are several motions brought by both parties:

(1) Western Digital's January 15, 2013, motion for partial summary judgment of noninfringement

of the '145 patent ("January 15 MPSJ"),[1] (2) Western Digital's July 23, 2013, motion for partial

---

[1] *See* Docket No. 131.

summary judgment of noninfringement of the '145 patent ("July 23 MPSJ"),[2] (3) Western Digital's motion for summary judgment on GTE's breach of contract claim,[3] (4) GTE's motion for summary judgment that the '145 patent is not anticipated or obvious,[4] and (5) GTE's motion to strike three of Western Digital's expert witnesses.[5]  The parties appeared for a hearing on these motions.

In this order, the court considers only Western Digital's noninfringement summary judgment motions and the parties' motions to file related documents under seal.[6]  The court considers the balance of the motions in companion orders.

Having considered the papers and the parties' oral arguments, the court DENIES both of Western Digital's motions for summary judgment of noninfringement.    The court GRANTS-IN-PART the parties' motions to seal.

## I. BACKGROUND

**A.    Factual Background**

The patents in this case describe hard drive disk test components.[7]  Hard drives consist of magnetic disks on which data is written.  Those magnetic disks encircle a motor-driven spindle hub that spins the disks.  To access the data, the hard drive uses a head-stack assembly ("HSA") with a head mounted on a pivot-arm module and a magnetic positioner.  The module and the positioner move the head above the spinning disk enabling the head to write data onto, or read data from, the disk.

---

[2] *See* Docket No. 235.

[3] *See* Docket No. 237.

[4] *See* Docket No. 238-2.

[5] *See* Docket No. 233.

[6] *See* Docket Nos. 238 and 251.

[7] Except where otherwise noted, the court derives these facts from GTE's complaint. *See* Docket No. 1.

Case No.: 5:11-cv-03786-PSG
ORDER RE: WESTERN DIGITAL'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT ON NONINFRINGEMENT

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The accuracy of the heads in accessing data on the disks is essential to the effectiveness of the hard drive.  Increases in the data capacity of the magnetic disks demand even greater precision. GTE purportedly addressed this need with its hard drive testers, which analyze the performance of the heads.  GTE sold testers to Read-Rite Corp. ("Read-Rite"), a head manufacturer. Western Digital, which used to purchase disk drive heads from Read-Rite, eventually acquired Read-Rite's assets.[8]

GTE argues both Read-Rite and Western Digital were subject to agreements that prohibited reverse engineering, decompiling, disassembling, or deriving source code from GTE's products. According to GTE, Western Digital violated the agreements and used GTE's testers and intellectual property to develop two testers of its own, the EH-300 and the DCT-400.  These testers use servo burst feedback and a thermal drift-compensated closed-loop positioning system to determine the accuracy of the heads.

At issue in this order is the '145 patent.  The '145 patent describes a "head/disk tester compris[ing] a thermal-drift compensated closed-loop positioning system that uses two sources of positioning feedback."[9]  The first source, linear encoders, "reflects the position of a magnetic head with respect to the magnetic disk in the absence of thermal drift."[10]  The second source, servo burst signals on the disk, "reflects the position of the magnetic head with respect to the magnetic disk in any temperature condition."[11]  The purpose of the invention is "to provide a head/disk tester that

---

[8] *See* Docket No. 79 at ¶ 19.

[9] Docket No. 1, Ex. A at 2.

[10] *Id.*

[11] *Id.*

3

Case No.: 5:11-cv-03786-PSG
ORDER RE: WESTERN DIGITAL'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT ON NONINFRINGEMENT

United States District Court
For the Northern District of California

effects accurate positioning of a magnetic head with respect to [a] magnetic disk in a tester, even in the case of unstable temperature conditions."[12]

The court has construed five terms from the '145 patent.[13]

United States District Court
For the Northern District of California

---

[12] *Id.*

[13] *See* Docket No. 224.

Case No.: 5:11-cv-03786-PSG
ORDER RE: WESTERN DIGITAL'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT ON NONINFRINGEMENT

| Disputed Term[14] | Court's Construction |
|---|---|
| "second feedback means for determining the position of said magnetic head with respect to said data track of said magnetic disk in varying temperature conditions" (claim 1) | Section 112(f) means-plus-function term<br><br>Function: "providing feedback for determining the position of said magnetic head, with respect to said data track of said magnetic disk in varying temperature conditions, using servo burst signals on said magnetic disk at predetermined positions radially offset from said track center line."<br><br>Structure:  "the read element of magnetic head and servo analyzer, including read element, read amplifier, detector, analog to digital converter and averager" |
| "means for reading said servo burst at each of said offsets in generating and storing signals representative of each read burst associated with each said offset" (claim 17) | Section 112(f) means-plus-function term<br><br>Function:  "reading said servo burst at each of said offsets and generating and storing signals representative of each read burst associated with each of said offsets"<br><br>Structure:  "servo analyzer, including read element, read amplifier, detector, analog to digital converter, average, and the memory of the position controller" |
| "closed loop positioner, responsive to said first feedback means and said second feedback means to control said positioning means, whereby said magnetic head is substantially at said desired offset from said track center line" (claim 1) | Plain and ordinary meaning – Section 112(f) does not apply |
| "means for pre-writing said servo burst signal at a plurality of positions along a track of said magnetic disk, and for detecting the amplitudes of said prewritten burst signals" (claims 6 and 7) | Section 112(f) means-plus-function term<br><br>Function:  "prewriting said servo burst signals at a plurality of positions along a track of said magnetic disks and detecting the amplitudes of said prewritten burst signals"<br><br>Structure:  "gate sequencer, write amplifier, detector and ADC, write element of the head, read element of the head, and encoder of spindle" |

---

[14] *See* Docket No. 123 at 128-31 (providing the constructions).

Case No.: 5:11-cv-03786-PSG
ORDER RE: WESTERN DIGITAL'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT ON NONINFRINGEMENT

United States District Court
For the Northern District of California

**B.**     **Procedural Background**

In August 2011, GTE filed this patent suit against Western Digital alleging infringement of U.S. Patent Nos. 6,023,145 ("the '145 patent") and 6,785,085 ("the '085 patent").  The complaint alleged Western Digital's products infringe claims 1-19 of the '145 patent  and claims 20, 21, 24, 25, 29, 30, 33, 34, 36, and 39 of the '085 patent.  Western Digital answered and filed a counterclaim alleging that the '145 patent and the '085 patent are invalid and that GTE infringes four Western Digital patents: U.S. Patent Nos. 5,640,089 ("the '089 patent"), 5,844,420 ("the '420 patent"), 6,891,696 ("the '696 patent"), and 7,480,116 ("the '116 patent").[15]

The court denied Western Digital's motion to dismiss and set a case management schedule[16] with a February 10, 2012, deadline for GTE to serve infringement contentions on Western Digital and related documents in compliance with Patent L.R. 3-1 and 3-2.[17]  The court held a claims construction hearing on September 25, 2012, and issued its constructions from the bench.

On January 15, 2013, Western Digital first moved for partial summary judgment of (1) invalidity and (2) noninfringement of claims 1-9, 11-16, and 17-18 of the '145 patent as well as (3) noninfringement of claims 20 and 29 of the '085 patent.  GTE opposed Western Digital's motion and moved for relief under Rule 56(d).  On March 12, 2013, the court heard arguments regarding the parties' summary judgment motions.

---

[15] *See* Docket No. 79.

[16] *See* Docket No. 48.

[17] *See* Docket No. 57.

Case No.: 5:11-cv-03786-PSG
ORDER RE: WESTERN DIGITAL'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT ON NONINFRINGEMENT

On February 6, 2013, the parties agreed to modify the case scheduling order: delaying the close of fact and expert discovery and the related deadline for dispositive motion practice. The trial date was continued from October 28, 2013, to December 2, 2013.[18]

On April 30, 2013, GTE sought leave on shortened time to amend its infringement contentions. GTE asserted that recently discovered evidence provided the requisite good cause for leave to amend. GTE, however, did not offer its proposed amended infringement contentions to the court or Western Digital. Instead, GTE sought leave only on the grounds that it had good cause and Western Digital would not be prejudiced based on its own assessment of its contentions.

On May 14, 2013, the court heard argument regarding GTE's motion for leave to amend its contentions and the court issued its order the same day denying GTE's request for leave. The court made no finding regarding either GTE's proffer of good cause or possible prejudice to Western Digital because, absent a review of the proposed infringement contentions, the court could not evaluate good cause or possible prejudice.[19]

On July 19, 2013, the court issued an order addressing the summary judgment motions and providing the court's reasoning for its earlier-issued claim constructions.[20] In the July 19 order, the court held that the term "relatively short period of time" was indefinite and thus rendered claims 17 and 19 of the '145 patent invalid.[21] The court also granted summary judgment in Western Digital's favor on noninfringement grounds on claims 20 and 29 of the '085 patent.[22] Finding GTE's

---

[18] *See* Docket No 143.

[19] *See* Docket No. 194.

[20] *See* Docket No. 224.

[21] *See* 35 U.S.C. § 112(b) ("The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention.").

[22] In Western Digital's original motion, Western Digital moved for summary judgment of claims 20, 21, 24, 25, 29, 30, 33, 34, 36, and 39. *See* Docket No. 131-1. In GTE's opposition, GTE

Case No.: 5:11-cv-03786-PSG
ORDER RE: WESTERN DIGITAL'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT ON NONINFRINGEMENT

Rule 56(d) request persuasive, the court declined to rule on Western Digital's motion for summary judgment on the issue of noninfringement of claims 1-9, 11-16, and 17-18 of the '145 patent, instead deferring the issue until the court addressed the parties' respective dispositive motions filed in July 2013.  The court invited both GTE and Western Digital to submit additional briefing (now before the court) regarding how GTE's subsequent discovery affected Western Digital's noninfringement arguments.

On July 29, 2013, the parties stipulated to dismissal of certain claims and counterclaims.[23] Western Digital agreed to dismiss with prejudice Counts V, VI, VII, and VIII of its counterclaims – specifically its claims that GTE infringed the '089 patent, the '420 patent, the '696 patent, and the '116 patent.  In turn, GTE agreed to dismiss without prejudice Counts One, Two, Three, Four, Five, Six, Seven, and Eight of its counterclaims, in which it sought declaratory judgment of noninfringement and invalidity of Western Digital's four patents at issue.  GTE also agreed to dismiss with prejudice its trade secret misappropriation claim against Western Digital.  GTE dropped all remaining claims from the '085 patent.

This case has significantly narrowed from the parties' original claims and counterclaims. For clarity, the court identifies the remaining claims: (1) GTE's infringement claim spanning claims 1-16 of the '145 patent, (2) Western Digital's claim for declaratory judgment of noninfringement and invalidity of the '085 and '145 patents, and (3) GTE's breach of contract claim.[24]

---

addressed only claims 20 and 29 because GTE dropped claims of infringement regarding claims 21, 24, 25, 30, 33, 34, 36, and 39.  *See* Docket No. 222 at 8, n.3.  The court thus addressed only claims 20 and 29 of the '085 Patent in its order.  *See* Docket No. 224.

[23] *See* Docket No. 248.

[24] *See* Docket No. 79.

Case No.: 5:11-cv-03786-PSG
ORDER RE: WESTERN DIGITAL'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT ON NONINFRINGEMENT

The court now turns to Western Digital's summary judgment motions regarding noninfringement of claims 1, 3-7, 11-13, and 15-16 of the '145 Patent.

## II. LEGAL STANDARDS

**A.      Summary Judgment**

Summary judgment is appropriate only if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[25]  The moving party bears the initial burden of production by identifying those portions of the pleadings, discovery, and affidavits which demonstrate the absence of a triable issue of material fact.[26]  If the moving party is the defendant, he may do so in two ways: by proffering "affirmative evidence that negates an essential element" of the nonmoving party's claim, or by demonstrating "the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim."[27]  If met by the moving party, the burden of production then shifts to the non-moving party, who must then provide specific facts showing a genuine issue of material fact for trial.[28]  The ultimate burden of persuasion, however, remains on the moving party.[29]  In reviewing the record, the court must construe the evidence and the inferences to be drawn from the underlying evidence in the light most favorable to the nonmoving party.[30]

---

[25] Fed. R. Civ. P. 56(a).

[26] *See* Fed. R. Civ. P. 56(c)(1); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[27] *Celotex*, 477 U.S. at 331.

[28] *See id.* at 330; *T.W. Elec. Service, Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) ("Rule 56 provides that summary judgment 'shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" (quoting Fed. R. Civ. P. 56(c)).

[29] *Celotex*, 477 U.S. at 330 (the "ultimate burden of persuasion" always "remains on the moving party").

[30] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (noting that "all evidence must be construed in the light most favorable to the party opposing summary judgment");

9

Case No.: 5:11-cv-03786-PSG
ORDER RE: WESTERN DIGITAL'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT ON NONINFRINGEMENT

**B.      Sealing Motions**

"Historically, courts have recognized a 'general right to inspect and copy public records and documents, including judicial records and documents.'"[31]   Accordingly, when considering a sealing request, "a 'strong presumption in favor of access' is the starting point."[32]   Parties seeking to seal judicial records relating to dispositive motions bear the burden of overcoming the presumption with "compelling reasons" that outweigh the general history of access and the public policies favoring disclosure.[33]

Records attached to nondispositive motions, however, are not subject to the strong presumption of access.[34]   Because the documents attached to nondispositive motions "are often unrelated, or only tangentially related, to the underlying cause of action," parties moving to seal must meet the lower "good cause" standard of Rule 26(c).[35]   As with dispositive motions, the standard applicable to nondispositive motions requires a "particularized showing"[36] that "specific prejudice or harm will result" if the information is disclosed.[37]   "Broad allegations of harm, unsubstantiated by specific examples of articulated reasoning" will not suffice.[38]   A protective

---

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (on "summary judgment the inferences to be drawn from the underlying facts" must "be viewed in the light most favorable to the party opposing the motion" (citations and quotations omitted)).

[31] *Kamakana v. City & County of Honolulu,* 447 F.3d 1172, 1178 (9th Cir. 2006) (quoting *Nixon v. Warner Commc'ns, Inc.,* 435 U.S. 589, 597 & n.7 (1978)).

[32] *Id.* (quoting *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003)).

[33] *Id.* at 1178-79.

[34] *See id.* at 1180.

[35] *Id.* at 1179 (internal quotations and citations omitted).

[36] *Id.*

[37] *Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1210-11 (9th Cir. 2002); *see* Fed. R. Civ. P. 26(c).

[38] *Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 476 (9th Cir. 1992).

10

Case No.: 5:11-cv-03786-PSG
ORDER RE: WESTERN DIGITAL'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT ON NONINFRINGEMENT

United States District Court
For the Northern District of California

1   order sealing the documents during discovery may reflect the court's previous determination that

2   good cause exists to keep the documents sealed,[39] but a blanket protective order that allows the

3   parties to designate confidential documents does not provide sufficient judicial scrutiny to

4   determine whether each particular document should remain sealed.[40]

5       In addition to making particularized showings of good cause, parties moving to seal

6   documents must comply with the procedures established by Civ. L.R. 79-5.  Pursuant to

7   Civ. L.R. 79-5(b), a sealing order is appropriate only upon a request that establishes the document

8   is "sealable," or "privileged or protectable as a trade secret or otherwise entitled to protection under

9   the law."  "The request must be narrowly tailored to seek sealing only of sealable material, and

10  must conform with Civil L.R. 79-5(d)."[41]  "Within 4 days of the filing of the Administrative

11  Motion to File Under Seal, the Designating Party must file a declaration as required by subsection

12  79-5(d)(1)(A) establishing that all of the designated material is sealable."[42]

13

14                              **III. DISCUSSION**

15      In the January 15 motion for partial summary judgment, Western Digital offers two grounds

16  for finding that its testers do not infringe claims from the '145 patent.  Western Digital first argues

17  that its testers do not infringe independent claim 1 (and claims 3-7, which depend on claim 1)

18

19

20  ─────────────────────

    [39] *See Kamakana,* 447 F.3d at 1179-80.

21
    [40] *See* Civ. L.R. 79-5(d)(1)(A) ("Reference to a stipulation or protective order that allows a party to
22  designate certain documents as confidential is not sufficient to establish that a document, or
    portions thereof, are sealable.").

23  [41] Civ. L.R. 79-5(b).  In part, Civ. L.R. 79-5(d)(1) requires the submitting party to attach a
    "proposed order that is narrowly tailored to seal only the sealable material" which "lists in table
24  format each document or portion thereof that is sought to be sealed" and an "unredacted version of
    the document" that indicates "by highlighting or other clear method, the portions of the document
25  that have been omitted" from the redacted version.

26  [42] Civ. L.R. 79-5(e)(1).  The Civil Local Rules have recently been amended shortening the time
    available to the designating party to file a supporting declaration from seven days to four days.  As
27  this rule change was only recently implemented the court applies the prior form of Civ. L.R. 79-5
    for the purposes of this order.

28                                          11

    Case No.: 5:11-cv-03786-PSG
    ORDER RE: WESTERN DIGITAL'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT ON
    NONINFRINGEMENT

1   because Western Digital's testers do not include all of the components that the court identified as

2   the requisite structure in its claim construction.  The court construed the means-plus-function term

3   in claim 1(f), "second feedback means," to require as its structure "the read element of magnetic

4   head and servo analyzer, including read amplifier, detector, analog to digital converter and

5   averager."[43]  Western Digital asserts that its testers do not have an analog to digital converter

6   ("ADC") or an averager and thus do not infringe.

7        Western Digital next argues that its testers do not infringe claim 11 (and claims 12-13 and

8   15-16, which depend on claim 11) because the testers do not calculate a "ratio of servo burst

9   signals" to "determine the position of the said magnetic head with respect to said magnetic disk" as

10  required by claim 11.[44]  Western Digital claims its testers instead use an analog subtractor that

11  subtracts the amplitude of one servo burst from the other and adjusts the head if the difference is

12  greater than zero.  The '145 patent, in contrast, describes calculating a ratio from the two servo

13  bursts – in other words, dividing rather than subtracting.

14      In its July 23 motion for partial summary judgment, Western Digital offers two additional

15  arguments that its testers do not infringe claims 1 and 3-7 of the '145 patent.  Western Digital

16  argues that the testers do not have a detector, an ADC, and an averager in the sequence that the

17  court provided in its claim construction and as identified in the patent's specification.  Western

18  Digital also argues that its testers do not have the detector described by the specification of the

19  '145 patent.

20      Rather than address Western Digital's arguments motion-by-motion, the court instead

21  considers first all of Western Digital's arguments regarding claims 1 and 3-7 before turning to its

22  argument regarding claims 11-13 and 15-16.

23

24

25

26  _____

27  [43] Docket No. 224 at 53.

28  [44] Docket No. 131-3, Ex. B at 9–10.

12

Case No.: 5:11-cv-03786-PSG
ORDER RE: WESTERN DIGITAL'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT ON
NONINFRINGEMENT

1

### 1.       Noninfringement of Claims 1 and 3-7

Within the ten briefs proffered by the parties on these claims,[45] the parties have advanced

numerous arguments regarding whether GTE has offered sufficient evidence to support its claim

that Western Digital's testers infringe claims 1 and 3-7 of the '145 patent.  All of these arguments

center on claim 1(f), the means-plus-function term that the court construed as requiring in part a

servo analyzer that includes a read amplifier, a detector, an ADC, and an averager.  Western Digital

argues that its testers do not have a servo analyzer that includes an averager, a detector, and an

ADC and, even if the testers contain the components, the components do not appear in the

sequence that the court identified.

GTE counters that Western Digital's testers have a structure for performing the "providing

feedback" function that is equivalent to the structure disclosed in the patent, including an ADC.

GTE offers its expert, Joshua Phinney ("Phinney"), in support of its claim that Western Digital's

testers have a read head that qualifies as the read element and a preamplifier that qualifies as a read

amplifier.  Phinney claims that the DCT-400 tester's M9 servo demodulator "contains the detector

and averager."[46]  According to Phinney, the M9 servo box has "two bandpass filters and two

Analog Devices AD8361ARM TruPwr Detectors" that serve as the "detectors."[47]  The bandpass

filters "are separately centered on the frequency of the servo bursts" and the "output of each

---

[45] The briefs at issue: (1) Docket No. 131 (Western Digital's January 15 Motion for Partial Summary Judgment of Non-Infringement ("MPSJ")), (2) Docket No. 137 (GTE's opposition to the January 15 MPSJ), (3) Docket No. 144 (Western Digital's Reply to the January 15 MPSJ), (4) Docket No. 146 (GTE's supplemental opposition to the January 15 MPSJ), (5) Docket No. 174 (Western Digital's supplemental reply to the January 15 MPSJ), (6) Docket No. 222 (GTE's Second Supplemental Opposition to the January 15 MPSJ), (7) Western Digital's second supplemental reply to the January 15 MPSJ, (8) Docket No. 235 (Western Digital's July 23 MPSJ), (9) Docket No. 263 (GTE's opposition to the July 23 MPSJ), and (10) Docket No. 278 (Western Digital's reply to the July 23 MPSJ).

[46] Docket No. 263-1, Ex. 8 at 16.

[47] *Id.*

Case No.: 5:11-cv-03786-PSG
ORDER RE: WESTERN DIGITAL'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT ON
NONINFRINGEMENT

bandpass filter is provided as an input to a respective one of the AD8361ARM Detectors."[48]

Phinney further explains that the AD8361ARM Detector "is a mean-responding power detector

with an output signal that is proportional to the root-mean-squared (rms) value of the input signal,"

which, according to Phinney, provides the same type output value as the averager described in the

'145 Patent.[49]  In other words, the AD8361ARM Detector (an RMS detector) is an averager.

Phinney also states the structure performing the "providing feedback" function includes an

ADC that is located on a separate board from the M9 servo box.  According to Phinney, the board

with the ADC is inserted into a PC running Microsoft Windows that controls the tester.[50]  As

Phinney describes the function, the servo analyzer "provides two outputs, one analog and one

digital," which are both "representative of the same signal, namely, one sample of the relative

magnitude of the servo bursts (the difference A-B, called the PES, or position error signal)."[51]  The

digital representation "is generated by ADC channels" on the board and "is accessible by control

software on the spinstand PC."[52]  The analog representation, on the other hand, "is provided to the

controller portions of the M9 servo box."[53]  According to Phinney, the position controller includes

both the PC that receives the digital output and the M9 servo box that receives the analog output.[54]

The digital output is stored in the PC's memory.[55]  The ADC in the board in the PC also apparently

digitizes the position error signal (i.e. the relative magnitude of the servo bursts, or difference

---

[48] *Id.*

[49] *Id.*

[50] *Id.* at 17.

[51] *Id.*

[52] *Id.*

[53] *Id.*

[54] *Id.*

[55] *Id.*

14

Case No.: 5:11-cv-03786-PSG
ORDER RE: WESTERN DIGITAL'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT ON
NONINFRINGEMENT

A-B).[56]  The PC uses "pulse timing circuitry within the M9, and synchronized with the spindle

encoder" to establish the "PES sampling window."[57]

GTE also points to a test in which the connection between the M9 servo box and the ADC

on the PC was cut.  Phinney states that as a result of cutting the line, the second feedback function

stopped working and an error message appeared.[58]  According to GTE, this test reveals that the

ADC is part of the structure providing the second feedback.  GTE also asserts that an analysis of

the tester source code revealed that the ADC is part of the second feedback function.

According to GTE, this evidence is at least sufficient to raise a triable issue of fact

regarding whether Western Digital's testers have a structure that performs the function of

claim 1(f) in the way that the '145 patent describes and with the same result.  GTE suggests that

Western Digital's arguments regarding the function of each component and the sequence of the

components impermissibly converts the components of the structure into additional claim

limitations.  GTE argues that such a component-by-component analysis is erroneous.

GTE has a point.  "Literal infringement of a § 112, ¶ 6 limitation requires that the relevant

structure in the accused device perform the identical function recited in the claim and be identical

or equivalent to the corresponding structure in the specification."[59]  "Functional identity and either

structural identity or equivalence are *both* necessary."[60]  An analysis of structural equivalence

under Section 112(f), like the doctrine of equivalents, "requires a determination of whether the

'way' the assertedly substitute structure performs the claimed function, and the 'result' of that

---

[56] *Id.* at 18.

[57] *Id.*

[58] *See* Docket No. 262 at ¶¶ 32-33.

[59] *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1267 (Fed. Cir. 1999).

[60] *Id.*

15

Case No.: 5:11-cv-03786-PSG
ORDER RE: WESTERN DIGITAL'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT ON
NONINFRINGEMENT

performance, is substantially different from the 'way' the claimed function is performed by the 'corresponding structure, acts, or materials described in the specification,' or its 'result.'"[61]  Unlike a doctrine of equivalents analysis, a structural equivalence argument requires identity of functions.[62]

But a determination of structural equivalence does not require a component-by-component analysis.[63]  "The individual components, if any, if an overall structure that corresponds to the claimed function are not claim limitations."[64]  "Rather, the claim limitation is the overall structure corresponding to the claimed function."[65]  Accordingly, "a claim limitation written in § 112, ¶ 6 form, like all claim limitations, must be met, literally or equivalently, for infringement to lie" and thus "such a limitation is literally met by structure, materials, or acts in the accused device that perform the claimed function in substantially the same way to achieve substantially the same result."[66]

As GTE rightly points out, the court's inquiry is not necessarily limited to whether Western Digital's testers include each of the components of the structure disclosed in the patent but whether Western Digital's testers have a structure that performs the function of claim 1(f) in the same way with the same result.  In other words, Western Digital's testers could literally infringe the '145 patent if the testers include a structure that provides "feedback for determining the position of said magnetic head" using "servo burst signals" in substantially the same way with substantially

---

[61] *Id.*

[62] *See id.*

[63] *Id.* at 1267-68.

[64] *Id.* at 1268.

[65] *Id.*

[66] *Id.*

16

Case No.: 5:11-cv-03786-PSG
ORDER RE: WESTERN DIGITAL'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT ON
NONINFRINGEMENT

the same result as the "read element and servo analyzer, including read amplifier, detector, analog to digital converter and averager."

Western Digital replies that GTE's argument may state the law correctly but GTE is offering for the first time in its papers a structural equivalents theory of infringement, one that was not included in its infringement contentions or in GTE's expert report.  According to Western Digital, GTE is foreclosed from asserting any theories that are inconsistent with its infringement contentions.

The court does not find GTE's infringement contentions to be so narrowly described that GTE's current theory of infringement – that the structure for claim 1(f) includes an ADC on a different board than the M8 and M9 servo decoders and that the RMS suffices for the detector and the averager – is inconsistent with its contentions.  GTE's contentions are broadly worded, asserting that the "structures in the EH-300 that perform the second feedback means include components of the M8 servo decoder and control box" and that the "structures in the DCT-400 that perform the second feedback means include components of the M9 servo decoder and control box."[67]  As GTE points out, a theory that includes components not in the M8 or M9 decoders is consistent with these contentions.

Western Digital highlights a statement in GTE's opposition to Western Digital's July 23 motion for partial summary judgment that Western Digital asserts is an admission that the RMS detector is a technology developed after the issuance of the '145 patent.  GTE stated that "at the time that the application for the '145 patent was filed, acceptable integrated circuit RMS detectors like those used in the Accused Products were not commercially available."[68]  Western Digital also points to a statement by Phinney in his declaration that RMS detectors are

---

[67] Docket No. 260, Ex. 1 at 16, 19.

[68] Docket No. 278 at 13.

17

Case No.: 5:11-cv-03786-PSG
ORDER RE: WESTERN DIGITAL'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT ON NONINFRINGEMENT

United States District Court
For the Northern District of California

"technological advances."[69]  Western Digital argues that, given these statements, GTE concedes that an RMS detector is an after-arising technology that cannot satisfy a structural equivalent theory of literal infringement.

Western Digital is right that a "structural equivalent under § 112 must have been available at the time of the issuance of the claim."[70]  "An equivalent structure or act under § 112 cannot embrace technology developed after the issuance of the patent because the literal meaning of a claim is fixed upon its issuance."[71]  "An 'after arising equivalent' infringes, if at all, under the doctrine of equivalents."[72]  Despite the similarity in the analyses, the doctrine of equivalents is distinct from structural equivalents for means-plus-function claims.

But depending on the nature of the structural equivalents and doctrine of equivalents theories, the mistaken assertion of one for the other is not necessarily fatal to a claim.[73]  "Both equivalence analyses, after all, apply similar analyses of insubstantiality of the differences."[74]  If "an accused product or process performs the identical function and yet avoids literal infringement for lack of a § 112, ¶ 6 structural equivalent, it may well fail to infringe the same functional element under the doctrine of equivalents."[75]  Likewise, when "there is identify of function and no after-arising technology, a means-plus-function claim element that is found to be infringed only

---

[69] Docket No. 262 at ¶ 10 n.2.

[70] *Al-Site Corp. v. VSI Intern. Inc.*, 174 F.3d 1308, 1320 (Fed. Cir. 1999).

[71] *Id.*

[72] *Id.*

[73] *See id.* at 1321.

[74] *Id.* (internal quotations omitted).

[75] *Id.* at 1322.

18

under the doctrine of equivalents . . . is also literally present in the accused device."[76]  Given this

overlap in the legal analyses between doctrine of equivalents and structural equivalents, GTE's

mistaken assertion of one theory for the other, more appropriate theory, while hardly a model of

clarity, is not fatal to GTE's claim.

### 2. Noninfringement of Claims 11-13 and 15-16

Western Digital asserts that its testers do not calculate the ratio of the servo bursts as

required by the '145 patent.  The testers instead use subtraction to compare the servo bursts and

thereby determine the position of the head with respect to the offset from the track center line.

According to Western Digital, as a result, its testers do not infringe claim 11, a method claim, or

claims 12-13 and 15-16, which depend on claim 11.

GTE does not dispute that Western Digital's testers do not use a ratio to compare the servo

burst amplitudes.  GTE in fact concedes that Western Digital's testers instead use an analog

subtractor.  GTE posits in its supplementary opposition that Western Digital interprets the term

"ratio" too narrowly to require only division of the servo burst signals, rather than a general

comparison between the signals.  GTE also offers evidence that Western Digital's testers infringe

under the doctrine of equivalents.

A reasonable jury could find that a comparison of the accused products meets the ratio

requirement of the claims.  As GTE's expert opines, "a given offset" must only be the result of a

"mathematical" operation.[77]  Whether Western Digital's testers practice this claim limitation under

a doctrine of equivalents theory is a genuine dispute of fact that requires jury determination.

---

[76] *Id.*

[77] Docket No. 260-1, ¶ H, Ex. 8.

Case No.: 5:11-cv-03786-PSG
ORDER RE: WESTERN DIGITAL'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT ON
NONINFRINGEMENT

# IV. SEALING ANALYSIS

**A.      Western Digital's Motion for Partial Summary Judgment of Noninfringement**

Western Digital seeks leave to file Exhibits to the Declaration of Michelle P. Woodhouse ("the Woodhouse Declaration") under seal.[78]  Specifically, Western Digital asks the court to seal Exhibits B, D, and E under seal because those documents contain its own confidential information. The court will address these requests in turn.  Western Digital also asks the court to seal Exhibits F and G to the Woodhouse Declaration, because they contain GTE's confidential information.

### 1.      Exhibit B, D and E to the Woodhouse Declaration

Western Digital requests leave to file Exhibit B, D, and E under seal.  Western Digital represents that Exhibit B, D, and E contain "confidential information about the structure and function of the Accused Products"[79] and makes a blanket assertion that the "parties' confidentiality interest therefore overcomes the right of public access to the record, as a substantial probability exists that the parties' overriding confidentiality interest will be prejudiced if the record is not sealed."[80]  Western Digital's representations do not constitute a particularized showing that specific prejudice or harm will result if the information is disclosed that satisfies the compelling reasons standard.  Western Digital's request with respect to Exhibit B, D, and E is DENIED.

### 2.      Exhibits F and G to the Woodhouse Declaration

Western Digital requests leave to file Exhibits F and G under seal because they have been designated "Highly Confidential – Attorney's Eyes Only" and "Confidential Information" by GTE pursuant to the protective order in this case.[81]

---

[78] *See* Docket No. 234.

[79] Docket No. 234-1 at ¶ 2.

[80] *Id.* at ¶ 3.

[81] Docket No. 234 at 2.

20

Case No.: 5:11-cv-03786-PSG
ORDER RE: WESTERN DIGITAL'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT ON NONINFRINGEMENT

GTE filed a timely declaration in support of Western Digital's sealing motion where it seeks leave from the court to file Exhibits F and G under seal.  These documents purportedly contain "confidential technical information relating to operation of GTE's products."[82]  GTE has not made a particularized showing that specific prejudice or harm will result if the information is disclosed that satisfies the compelling reasons standard.  Western Digital's request with respect to Exhibit F and G is DENIED.

**B.    GTE's Opposition to Western Digital's Motion for Partial Summary Judgment of Noninfringement**

GTE requests leave to file documents under seal related to its opposition to Western Digital's motion for partial summary judgment presently before the court.[83]  GTE represents that (1) Exhibits 34-38 to the the Kolassa Declaration contain confidential information designated by GTE as "Confidential" and (2) GTE's opposition to Western Digital's motion for partial summary judgment, the Phinney Declaration, Exhibits 3-6, 8, 12-28, 31-33 and 39-40 to the Kolassa Declaration, and the Rogaski Declaration as well as Exhibits 1 and 2 to the Rogaski Declaration contain confidential information disclosed by Western Digital pursuant to the protective order in this case.[84]  These documents are considered below.

**1.    Exhibits 34-38 to the Kolassa Declaration**

GTE seeks leave to file Exhibits 34-38 to the Kolassa Declaration under seal.  These exhibits contain information designated by GTE as "Confidential."[85]  GTE argues Exhibits 34-36

---

[82] Docket No. 250 at ¶¶ 6-7.

[83] *See* Docket Nos. 260 and 262 (requesting leave to file GTE's Opposition to Western Digital's Motion for Partial Summary Judgment on Non-Infringement, the supporting declaration of Joshua W. Phinney ("the Phinney Declaration"), Exhibits 3-6, 8, 12-28 and 31-40 to the supporting declaration of Scott E. Kolassa ("the Kolassa Declaration"), and the Declaration of Anne Rogaski ("the Rogaski Declaration") as well as Exhibits 1 and 2 to the Rogaski Declaration under seal).

[84] *See* Docket No. 262 at 7.

[85] *See id.*

21

and 38 contain "confidential and proprietary technical information of a non-party,

[Texas Instruments], to this action."  GTE has not made a particularized showing that specific

prejudice or harm will result if the information is disclosed that satisfies the compelling reasons

standard.  The court also notes that Texas Instruments has not filed a sealing motion supporting the

sealing of these documents.  Western Digital's request with respect to Exhibit 34-36 and 38 is

DENIED.

GTE also argues that Exhibit 37 "contains sensitive information of GTE, and of third

parties, whose disclosure would harm GTE's competitive standing."[86]  After reviewing GTE's

representation and the exhibit itself, the court is convinced that GTE has met the compelling

reasons standard as to Exhibit 37.  GTE's request to seal Exhibit 37 to the Kolassa Declaration is

GRANTED.

> ### 2. GTE's Opposition to Western Digital's Motion for Partial Summary Judgment of Noninfringement, the Phinney Declaration, Exhibits 3-6, 8, 12-28, 31-33, and 39-40 to the Kolassa Declaration, and the Rogaski Declaration as well as Exhibits 1 and 2 to the Rogaski Declaration

Western Digital filed two timely declarations supporting GTE's sealing motions.[87]  In those

declarations Western Digital acknowledges that sealing the Rogaski Declaration is not warranted.

Western Digital represents that GTE's opposition to Western Digital's motion for partial summary

judgment and the Phinney Declaration contain "detailed descriptions and analyses of the design

and function of Western Digital's devices and processes, and technical details of Western Digital's

technology that were disclosed under the parties' Protective Order."[88]  With regard to Exhibits 3-6,

8, 12-28, 31-33, and 39-40 to the Kolassa Declaration and Exhibits 1 and 2 to the Rogaski

Declaration, Western Digital makes a blanket assertion that these documents contain details about

---

[86] Docket No. 262-1 at ¶ 4.

[87] *See* Docket Nos. 271 and 272.

[88] Docket No. 272 at ¶¶ 34, 36.

Case No.: 5:11-cv-03786-PSG
ORDER RE: WESTERN DIGITAL'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT ON NONINFRINGEMENT

the structure, function and/or development of the Western Digital accused products.[89]

Western Digital claims its "confidentiality interest therefore overcomes the right of public access to the record, as a substantial probability exists that the parties' overriding confidentiality interest will be prejudiced if the record is not sealed."[90]  Western Digital has not made a particularized showing that specific prejudice or harm will result if the information is disclosed that satisfies the compelling reasons standard.  GTE's request with respect to its opposition to Western Digital's motion for partial summary judgment, the Phinney Declaration, Exhibits 3-6, 8, 12-28, 31-33, and 39-40 to the Kolassa Declaration, and the Rogaski Declaration as well as Exhibits 1 and 2 to the Rogaski Declaration is DENIED.

## C.   Western Digital's Reply in support of its Motion for Partial Summary Judgment of Non-infringement

Western Digital requests leave to file documents under seal related to its reply in support of its motion for partial summary judgment presently before the court.[91]  Western Digital represents that (1) Exhibits B and C to the Second Woodhouse Declaration and Exhibits N-P to the Frenkel Declaration contain Western Digital's confidential information that must be filed under seal pursuant to the parties' Protective Order in this action and (2) Exhibits D and E to the Woodhouse Declaration contain information designated by GTE as "Highly Confidential – Attorney Eyes Only and Confidential Information" pursuant to the protective order in this case.[92]  The court considers each group of exhibits in turn.

---

[89] *See* Docket Nos. 271 and 272.

[90] *Id.*

[91] *See* Docket No. 276 (requesting leave to file Exhibits B-E to the Declaration of Michelle P. Woodhouse ("the Second Woodhouse Declaration") in support of Western Digital's reply and supplemental reply to its motions for partial summary judgment of noninfringement and Exhibits N-P to the supporting Declaration of Richard G. Frenkel ("the Frenkel Declaration") under seal).

[92] *See* Docket No. 276 at 2.

23

Case No.: 5:11-cv-03786-PSG
ORDER RE: WESTERN DIGITAL'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT ON NONINFRINGEMENT

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

**1.      Exhibits B and C to the Woodhouse Declaration and Exhibits N-P to the Frenkel Declaration**

Western Digital requests leave to file Exhibits B and C to the Woodhouse Declaration and Exhibits N-P to the Frenkel Declaration under seal.  Western Digital represents that Exhibits B and C to the Woodhouse Declaration contain "confidential information about the structure and function of the Accused Products."[93]  Exhibits N-P to the Frenkel Declaration are letters from counsel for GTE to counsel for Western Digital "in regards to the inspection of the Accused Products and contain details about the structure, function and operation of the Accused Products."[94]  As above, Western Digital makes the same general, blanket assertion that its "confidentiality interest therefore overcomes the right of public access to the record, as a substantial probability exists that the parties' overriding confidentiality interest will be prejudiced if the record is not sealed."[95]  Again, Western Digital's request does not satisfy the compelling reasons standard. Western Digital's request with respect to Exhibits B and C to the Woodhouse Declaration and Exhibits N-P to the Frenkel Declaration is DENIED.

**2.      Exhibits D and E to the Woodhouse Declaration**

GTE filed a timely declaration in support of Western Digital's sealing motion where it acknowledged that sealing is not warranted with regard to Exhibit D to the Woodhouse Declaration because the particular deposition transcript excerpted in the Exhibit does not contain any confidential and proprietary information of GTE.[96]  GTE does ask the court to seal Exhibit E to the

---

[93] Docket No. 283 at ¶ 2.

[94] *Id.*

[95] Docket No. 283 at ¶ 3.

[96] *See* Docket No. 293 at ¶ 4.

Case No.: 5:11-cv-03786-PSG
ORDER RE: WESTERN DIGITAL'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT ON NONINFRINGEMENT

Woodhouse Declaration.[97]   GTE represents that the document "contains technical details and descriptions regarding GTE's head/disk testers.  Public disclosure of such information to GTE's competitors would pose a significant competitive disadvantage to GTE."[98]   After reviewing GTE's representation and the exhibit, the court is convinced that GTE has met the compelling reasons standard as to Exhibit E.  Western Digital's request to seal Exhibit E to the Woodhouse Declaration is GRANTED.  Western Digital's request to seal Exhibit D to the Woodhouse Declaration is DENIED.

**IT IS SO ORDERED.**

Dated: November 19, 2013

PAUL S. GREWAL
United States Magistrate Judge

---

[97] *See id.* at ¶ 5.

[98] *Id.* at ¶ 6.

25

Case No.: 5:11-cv-03786-PSG
ORDER RE: WESTERN DIGITAL'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT ON
NONINFRINGEMENT